# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| **Vince J. Lennon,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No.: 2:18-cv-00967-WC** |
| ) | |
| **Alabama Telecasters, Inc.,** ) | |
| **d/b/a WAKA,** ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |

## FIRST AMENDED COMPLAINT

**COMES NOW** the Plaintiff, Vince J. Lennon (hereinafter "Plaintiff" or "Lennon"), by and through his attorneys of record, and pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, files this his First Amended Complaint against the Defendant, Alabama Telecasters, Inc., d/b/a WAKA (hereinafter "Defendant" or "WAKA"), and states as follows:

## STATEMENT OF THE CASE

1. This is a lawsuit brought by the Plaintiff, who has been affected by the discrimination and wrongful acts alleged in the claims set forth below, seeking permanent relief from unlawful discriminatory practices involving the Defendant's failure to remedy systemic employment discrimination and mistreatment on the basis of race/ethnicity, unlawful breach of contract, and fraud.  The practices

committed by Defendant violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"), and Alabama state law.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  This Court has jurisdiction over the Plaintiff's pendent state law claims under 28 U.S.C. § 1367.

3.    Plaintiff is a resident of, and domiciled in, the state of Georgia. Defendant is an Alabama corporation, located within this judicial district and division, and the acts or omissions complained of in this lawsuit are believed to have occurred in Montgomery County, Alabama, making venue proper under 28 U.S.C. § 1391(b).

## PARTIES

4.    Vince Lennon is a fifty-one year old male resident of Spanish race, ethnicity and ancestry, specifically he is from Europe and he is of Castillian and Basque ethnicity and ancestry who currently is domiciled in Georgia.  Lennon was an employee of Defendant at all relevant times within the meaning of 42 U.S.C. § 1981.

5.    Defendant is an Alabama corporation, incorporated in Montgomery County.  Defendant's principal place of business is in Montgomery County, Alabama.  At all times relevant to this suit, Defendant was the employer of

Plaintiff within the meaning of 42 U.S.C. § 1981.

## STATEMENT OF FACTS

6. Lennon is a fifty-one year old American male of European Spanish descent who worked for Defendant as a Sports Director.

7. Prior to his employment with Defendant, Lennon was working for WRCB in Chattanooga, Tennessee, as a Sports Anchor and Reporter.

8. Lennon has extensive ties to Chattanooga, having attended Chattanooga State Community College and the University of Tennessee-Chattanooga.

9. In over twenty-five years of working in the news industry, Lennon worked for all three of the Chattanooga news stations, including WTVC-TV, WTCI-TV, and WDEF-TV.

10. On or about November of 2015, while happily working for WRCB in Chattanooga, Lennon traveled to Montgomery to meet with the news director for WAKA, Mr. Glen Halbrooks (hereinafter "Halbrooks").

11. At that time, Lennon was under contract with WRCB in Chattanooga until January of 2016.

12. Lennon's job with WRCB was secure; the news director for WRCB had told him that WRCB intended to renew his employment contract. Also, Lennon was told that he would become the Sports Director for WRCB when the

current one left.

13. During Lennon's interview, Halbrooks lured Lennon away from his home market of Chattanooga, enticing him with the representation that, throughout his employment, he would be the sports director of a three-person department.

14. Halbrooks told Lennon that all three of those employees would have their own camera, and that all three would be available for Friday night football.

15. In that conversation, Halbrooks also promised Lennon that, throughout his employment, three fully- staffed bureaus that would shoot, edit, and produce high school football highlights.

16. Halbrooks told Lennon that he would have a say in who was hired and fired within his department.

17. Those representations turned out to be false.

18. Plaintiff's department was staffed with three employees for only a few months, with one employee leaving in May, and Defendant firing another in July. From May until Lennon's termination in November, the department was never fully staffed as promised.

19. Defendant did not produce the three promised cameras; instead it provided only two.

20. Once the actual football season began, the bureau reporters and photographers never shot, edited or produced highlights as Halbrooks had

promised, leaving the coverage of games near Selma, Troy and Greenville constantly imperiled by the lack of staffing.

21. On or about the first week of December 2015, Defendant offered Lennon the job.

22. Defendant presented Lennon with an employment contract which provided a term of employment from January 11, 2016 through January 7, 2017, with twenty-six bi-weekly pay periods.

23. Defendant held two options to extend the term for a period of twenty-six bi-weekly pay periods each.

24. The employment contract provided Defendant with the right to terminate the agreement for cause or if Lennon's work was unsatisfactory.

25. The contract provided a makeup allowance of two-hundred dollars which would be paid to Lennon. It was never paid.

26. As a consequence of the representations made to him by Halbrooks, Lennon signed the contract on December 17, 2015, and began his move to Montgomery.

27. As agreed, Lennon started his job as sports director for Defendant on January 11, 2016.

28. In that role, Lennon reported to Halbrooks, the news director.

29. Plaintiff's responsibilities included producing and anchoring the five-

thirty, six, nine and ten o' clock p.m. weeknight sportscasts.

30. When Lennon arrived, Halbrooks stated to Lennon that "at 48 or 49, we know this may be your last stop." Halbrooks went on to say, "We want this to be your last stop and we're going to do everything we can to make you happy."

31. Lennon was paid a $60,000 salary, and provided with health insurance, dental insurance, and a 401(k) retirement plan.

32. Lennon's first day on the air was January 18, 2016.

33. Lennon's wife was working as the managing editor for True North Custom Media in Chattanooga, Tennessee. She left her job to move to Montgomery with Lennon, where she was never able to find gainful employment.

34. After Lennon started work for Defendant, he and his wife purchased a house in Montgomery.

35. From early on, Jeff Sanders (hereinafter "Sanders"), the news operations manager and five-o-clock co-anchor, had it in for Lennon because Sanders thought that Lennon was having an affair with six-o-clock anchor Stephanie Hicks, who was Sanders' ex-wife. That suspicion was false.

36. Soon after Plaintiff began his job, Sanders began making sexual remarks to Plaintiff regarding Hicks.

37. This began with Sanders asking Plaintiff "do you want those titties?" and then stating, "those nipples are so hairy you could floss your teeth while

6

sucking on them."

38. Plaintiff did not respond, yet Sanders continued by stating "eating that pussy is like choking on a tribble."

39. Sanders turned his harassment to Lennon, taking issue with the fact that Plaintiff performed his microphone checks by speaking numbers in Spanish and saying "hola" on the air.

40. For more than twenty years, Lennon had performed his microphone check in that manner and had never had anyone take issue with it.

41. Sanders would often harass Plaintiff about his microphone checks, telling him to "stop speaking spic," and "stop speaking Mexican."

42. At one point, Plaintiff pointed out to Sanders that he was not speaking "Mexican," but was speaking Spanish, to which Sanders remarked, "same shit."

43. On another occasion Sanders taunted Plaintiff, stating, "I'm bilingual too, get me a taco paco," and then asking, "how do you say taco in Spanish?" Sanders then stated "Paco, taco, now o."

44. In August, Sanders took the harassment to another level when during a live broadcast, he recorded Plaintiff's sportscast using his company owned iPhone. Sanders then edited the image, laying a target on Lennon's face with arrows that would puncture his face for points.

45. Sanders sent that image to Lennon's phone **during** the broadcast.

During the next commercial break, Sanders motioned to Lennon's phone and told him that it went off during the broadcast.

 46. Lennon looked at his phone, finding the image of the target painted over his face and asked Sanders why he sent it to him.

 47. Sanders replied with, "stop speaking spic!", to which Lennon said, "what?"

 48. Sanders replied in an exaggerated southern drawl that "we don't talk like that around here."

 49. Lennon later discovered that Sanders had posted the same video to Lennon's work-related Facebook page.

 50. A few days after the target incident, Lennon pointed out to Sanders that his heritage was Spanish, not Mexican, to which Sanders replied "same shit" in a demeaning manner.

 51. In or about July of 2016, Sanders came in Lennon's office swinging an axe around.  Plaintiff was unsettled by that, and told him he could go outside to the deck circle if he wanted to swing the axe.

 52. In response, Sanders walked up to Plaintiff and motioned to his midsection, stating that he could rename Plaintiff "Bobbit"[1] with a single chop, which "wouldn't be good for the Latin lover."

---

[1] Plaintiff assumed Sanders was referring to John Bobbit, whose wife, Lorena, had severed his penis with a knife in a story that garnered national attention.

53. In September, after a live show in Auburn, Lennon drove Sanders and A.J. Williams back to the news station because neither of them wanted to drive in order to watch the Alabama football game on their phones.

54. Lennon noticed when he got on I-85 that it was 7:27 p.m. on the news car's digital clock, and he also noticed that he was located at mile marker forty-eight.

55. The group arrived at the station at approximately 8:10 p.m. according to the security door, which meant they travelled approximately 47 miles in 40 minutes.

56. A week later, Sanders complained to Halbrooks that Lennon was driving one-hundred miles per hour during the trip, which was false.

57. When confronted with the allegation, Plaintiff was completely honest, stating that highest speed he reached during the drive was eighty-five miles per hour.

58. Defendant could have easily verified Plaintiff's story by inspecting the cell phone pings, but chose not to investigate.

59. Instead, Defendant suspended Lennon for three days without pay, threatening him with termination if he did not agree with them and sign the suspension document.

60. Lennon discovered that Defendant had posted his job to industry

employment webpages via a blind box advertisement while he was suspended.

61. On Plaintiff's first day back at the office, chief photographer Bill Gill (hereinafter "Gill") and Halbrooks deliberately had a conversation in front of Lennon about a speeding ticket Gill had just received while operating a company vehicle.

62. Gill nonchalantly stated to Halbrooks that he "got another ticket," and asked Halbrooks what he wanted him to do about it.

63. Halbrooks casually replied, "you take care of it and I'll take care of it," in a casual manner which indicated that the ticket was inconsequential.

64. Lennon was never ticketed, yet he was suspended by Halbrooks for three days based on an unsubstantiated, false accusation made by Sanders. Gill, on the other hand, was actually ticketed while speeding in a company-owned vehicle, yet Halbrooks acted casually about the matter and never punished Gill.

65. Also, after returning from his suspension, Sanders revealed to Lennon that he had seized Plaintiff's newsroom mailbox for a newly hired trainee while Plaintiff was suspended.

66. On Election Day, Lennon was informed that the sports broadcast was cancelled, and told to stay home and take a well-deserved day off.

67. While Lennon was away, Defendant conducted a "mannequin challenge," with everyone except Plaintiff participating in the story.

68.     On or about November 17, 2016, Halbrooks and Sanders gave Lennon a letter which stated that WAKA had chosen not to exercise its option to extend Plaintiff's employment contract.

69.     The letter, dated November 15, 2016, and signed by Vice President and General Manager Jesse Grear, stated that Plaintiff's last day of employment would be January 7, 2017.

70.     The letter gave no reason for Defendant's decision not to renew Plaintiff's contract.

71.     Despite the fact that the letter stated Lennon would continue to work until January, Lennon was walked out of the building by Halbrooks, station manager Mark Smith, and Laura Ross from human resources on November 21, 2016, leaving Plaintiff terminated without cause.

72.     Sanders, Carter, and A.J. Williams were promoted the day after Plaintiff was terminated.

73.     Plaintiff was never given a reason for his termination.

74.     On the day of Lennon's termination, WAKA's agent Ivy Carter (hereinafter "Carter") told others in the industry that Plaintiff had quit his job.

75.     The statement that Plaintiff quit his job was false.

76.     WAKA and Carter knew that the story of an Alabama-based sports director quitting his job during the week of the Iron Bowl, one of the biggest sports

weekends in Alabama and one of the biggest rivalry football games in the nation, would be highly frowned upon in the news industry.

77. Lennon was replaced as sports director by Adam Solomon, who is Caucasian-American and who is not of Spanish, Castilian or Basque race, descent or ethnicity.

78. As a result of Defendant's actions, Plaintiff has been unable to find a job since he was terminated, and was forced to sell both his Montgomery home and his retirement home because of financial hardship.

## COUNT ONE
## 42 U.S.C. § 1981:
## RACE DISCRIMINATION

79. Plaintiff adopts and re-alleges each and every allegation contained in this Complaint as if set out anew herein.

80. When Plaintiff accepted employment with Defendant, he entered into a contract with Defendant, whereby he was entitled to the enjoyment of all the same benefits, privileges, terms and conditions of the contractual relationship as his non-Spanish heritage-American counterparts who reported to the same supervisors as Plaintiff, including Gill, Sanders, Carter and A.J. Williams, and all of whom are of a different race, ethnicity and ancestry than Plaintiff.

81. When Defendant denied Plaintiff support and opportunities for career advancement, promotion, and equal earning opportunities, it interfered with its

contract with Lennon and otherwise denied Lennon the benefits and privileges of the contract based upon his race, ethnicity and ancestry.

82. Defendant's denial of the benefits and privileges of the contract with Plaintiff was intentional, malicious and otherwise in reckless disregard of Plaintiff's rights under Section 1981. Defendant's supervisor was aware of Plaintiff's race, ethnicity and ancestry.

83. In taking the above-described actions, Defendant intentionally and willfully discriminated against Plaintiff due to his race, ethnicity and ancestry, Spanish (Castilian and Basque), in violation of § 1981. Plaintiff, a Spanish-American, of Castilian and Basque race, ethnicity and ancestry, was not treated the same as his Caucasian peers and peers that were of different ethnicity, race and/or ancestry than Plaintiff regarding the continuance of the contractual relationship as well as in the terms and conditions of employment and termination.

84. Defendant's actions were in violation of §1981 and the XIII Amendment to the Constitution, and were taken with malice or reckless indifference to the federally-protected rights of Plaintiff.

85. As a proximate consequence of the violations of 42 U.S.C. § 1981 by Defendant, Plaintiff has suffered and will continue to suffer damage to his professional life and future career opportunities, future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and non-pecuniary

damage.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff requests the following relief:

a. Placement in the position(s) in which he would have worked absent Defendant's discriminatory treatment; or, in lieu thereof, front pay;

b. All back pay from the date of his wrongful termination;

c. An injunction ordering Defendant to cease its discriminatory practices as described herein;

d. Pre-judgment interest;

e. Attorneys' fees;

f. Costs;

g. Compensatory damages for loss of wages, loss of benefits, including, but not limited to, retirement benefits, mental anguish, emotional distress, embarrassment, both past and future;

h. Punitive damages, to deter such conduct in the future; and

i. Such other legal or equitable relief as may be appropriate to effectuate the purposes of § 1981 and the XIII Amendment to the Constitution, or to which he may be entitled.

## COUNT II
## FRAUD

86. Plaintiff adopts and re-alleges each and every allegation in this Complaint as if set out anew herein.

87. Lennon alleges that Defendant, by and through its agent(s), who were acting within the line and scope of their employment, caused and intended to cause

or negligently, inadvertently, or mistakenly caused, Plaintiff to rely on fraudulent material representations, or other wrongful acts, to his detriment by engaging in the conduct set forth hereinabove.

88. Specifically, as set forth in Paragraphs 13 through 16 above, Defendant, by and through Lennon's supervisor Halbrooks, made representations to Plaintiff that, throughout his employment, he would be the sports director of a three-person department, that all three of these employees would have their own camera, and that all three would be available for Friday night football. Defendant represented that, throughout his employment, Plaintiff would have a say in the hiring and firing within his department. Defendant also represented to Plaintiff that, throughout his employment, he would have three fully staffed bureaus available to shoot, edit, and produce high school football highlights. Those statements were made with the knowledge that they were false at the time they were made and with the intent that Plaintiff would rely on them to his detriment. At the time of making those statements, Defendant, by and through its agent, Halbrooks, had no intent to perform those promises and Halbrooks intended, by those statements, to deceive Plaintiff. Defendant's agent Halbrooks also stated that "at 48 or 49 we know this may be your last stop, we want this to be your last stop and we're going to do everything we can to make you happy."

89. Lennon alleges that he reasonably relied on these representations to

leave stable employment, relocate, and join Defendant due to the assurances made by Defendant's agents, and on which his wife relied in giving up her stable employment and following Plaintiff to Montgomery, and which led them to buy a new house in Montgomery, which representations said agents knew to be false, or were made wantonly, recklessly, heedlessly, or negligently, without regard for the truth or falsity of the representations.

90. Plaintiff alleges that the misrepresentations of Defendant were intentional, gross, oppressive, malicious, and were committed as stated herein with the intention of causing Plaintiff to give up stable employment and relocate, thereby causing him financial loss and economic hardship, and ultimately further loss when Defendant failed to pay him the salary due him under his contract and failed to pay him the make-up allowance that was due under the contract.

91. The wrongful conduct of Defendant's agent(s) combined and concurred to proximately cause Plaintiff to suffer financial loss, economic hardship, embarrassment, humiliation, and mental anguish.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff requests the following relief:

    a.    Compensatory damages;

    b.    Punitive damages to deter such conduct in the future;

    c.    Costs;

    d.    Interest;

    e.    Attorneys' fees; and

    f.    Any and all other relief to which he may reasonably be entitled.

## COUNT THREE
## BREACH OF CONTRACT

92. Plaintiff adopts and re-alleges each and every allegation in this Complaint as if set out anew herein.

93. Plaintiff was provided with an "Employment Contract" which indicated a starting date of January 11, 2016 and an end date of January 7, 2017. The contract made it clear that Plaintiff was to receive $1,153.85 per week, less standard deductions for that period. Defendant had two options to extend the term, each for twenty-six bi-weekly pay periods at specific, higher pay rates. In addition to the salary specified, the contract also provided for a $200 make up allowance for each year.

94. Plaintiff signed his acknowledgment of this Employment Contract on December 17, 2015.

95. Defendant breached that agreement by terminating Lennon without cause in November of 2016. Plaintiff suffered damages in that Defendant failed to pay Plaintiff his salary which was due under the contract. Defendant also breached the agreement and Plaintiff suffered damages when it failed to pay Plaintiff's make-up allowance, which is due and owing for the remainder of 2016 and 2017.

96. The breach of contract by Defendant combined and concurred to proximately cause the Plaintiff to suffer financial loss specified in Paragraph 95 herein, as well as economic hardship, loss of benefits, embarrassment, humiliation, and mental pain and anguish.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff requests the following relief:

    a.    Compensatory damages;

    b.    Costs;

    c.    Interest;

    d.    Attorneys' fees; and

    e.    Any and all other relief to which he may reasonably be entitled.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.**

        **Respectfully submitted,**

        __/s/ Donna S. Cude_____
        **John D. Saxon**
        **Alabama Bar No. ASB-3258-071J**
        **Donna S. Cude**
        **Alabama Bar No. ASB-7680-W18A**
        **Attorneys for Plaintiff**

**OF COUNSEL:**

**JOHN D. SAXON, P.C.**
**2119 3rd Avenue North**
**Birmingham, AL 35203**
**Telephone:  (205) 324-0223**
**Facsimile:  (205) 323-1853**
**Email:       jsaxon@saxonattorneys.com**
**                  dcude@saxonattorneys.com**

### CERTIFICATE OF SERVICE

The undersigned certifies that by filing this document on the CM/ECF system, Plaintiff has met the requirement of service upon counsel for Defendant Alabama Telecasters, Inc., d/b/a WAKA's designated email address as follows:

> Wesley C. Redmond, Esq.
> Susan W. Bullock
> **FORD HARRISON LLP**
> 420 20th Street North, Suite 2560
> Birmingham, Alabama 35203
> wredmond@fordharrison.com
> sbullock@fordharrison.com

Done this 1st day of March, 2019.

> /s/ Donna S. Cude
> **OF COUNSEL**