IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| VINCE J. LENNON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACT. NO. 2:18-cv-967-ECM |
| | ) (WO) |
| ALABAMA TELECASTERS, INC | ) |
| d/b/a WAKA, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

**I.      INTRODUCTION**

Vince Lennon ("Plaintiff") seeks compensatory and punitive damages and injunctive relief pursuant 42 U.S.C. § 1981 and compensatory damages under state contract law against Alabama Telecasters, Inc d/b/a WAKA ("Defendant") (hereinafter "WAKA"). The Plaintiff alleges the Defendant discriminated against him because of his Spanish race[1] when not extending his employment contract, and the Defendant breached his employment contract by not paying his two-hundred-dollar makeup stipend.  Currently pending before the Court is the Defendant's motion for summary judgment. (Doc. 58).  After carefully reviewing the Defendant's motion for summary judgment, the Plaintiff's response thereto, and the evidentiary materials, the Court concludes that the motion is due to be GRANTED.

---

[1] Plaintiff identifies his race as both Spanish and Basque.  For the purposes of this opinion, the Court will simply refer to the Plaintiff's race as "Spanish."

## II.   JURISDICTION

The Court exercises subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331.  Personal jurisdiction and venue are uncontested.

## III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED.R.CIV.P. 56(a)).  "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.*  The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

2

## IV.  FACTS

While working at a TV station in Chattanooga, Tennessee, Vince Lennon reached out to Glenn Halbrooks, WAKA's News Director, about a long-posted sports director position at the station in Montgomery. (Doc. 59-1 at 29).  The position interested Lennon because he would receive an increase in salary and would be "the main sports guy" in a market "where sports [are] really important." (*Id*. at 30).  Lennon applied and was ultimately hired to be WAKA's new sports director.  On December 17, 2015, Lennon signed an employment contract that specified the term of employment would be from January 11, 2016 to January 7, 2017 with an option to extend his contract for two one-year periods. (Doc. 59-3 at 2, 10).

Lennon describes himself as being of the Spanish race, specifically from Castille and the Basque region.  (Doc. 60 at 4).  Lennon explains that his father's mother's family originally immigrated from Spain to Puerto Rico. (Doc. 60 at 5).  He describes his grandmother as being of Spanish descent, but he cannot be sure if she was 100% Spanish. (Doc. 67 at 6).  Based on his lineage and family history, the Lennon explains that he is 25% Spanish. (*Id.*). Based on a DNA genealogical test, Lennon was found to be 7% Spanish, 11% Iberian,[2] and 13.1% other Hispanic. (Doc. 67 at 7).  When asked what Spanish cultural traditions he follows, Lennon explained, "I spoke a little Spanish," and "I eat a lot of Mexican food, and growing up in Tampa, we have a very heavy Cuban population.  So I

---

[2] [*Iberia*, peninsula in southwestern Europe that contains Spain and Portugal] . . . A native or inhabitant of Spain or Portugal or the Basque region about the Pyrenees. *Iberian*, Webster's Third New International Dictionary, (3rd ed. 1966).

eat Ropa Vieja y picadillo and just about anything I can get Spanishwise." (Docs. 60 at 10; 59-1 at 85).

After a few weeks working at WAKA, Lennon checked if a microphone was properly working before a broadcast by counting in Spanish. (Doc. 59-1 at 55).   Jeff Sanders, a news anchor and operations manager, asked Lennon why he was speaking in Spanish. (Docs. 60 at 4; 59-1 at 55).   Lennon replied that he was just testing the microphone. (Doc. 59-1 at 55).   Lennon did not think much of Sander's comment. (*Id.*).   The following day while Lennon was eating tacos—which he eats because of a gluten allergy—Sanders stated, "you really embrace your heritage." (Docs. 59-1 at 59; 59-6 at 7).

In February, Lennon again spoke in Spanish, and Sanders said, "we don't talk like that around here." (Doc. 59-1 at 59).   A week later Sanders said, "Don't confuse the productions guys speaking in Spanish, we can hardly get them to count in English." (*Id*. at 60).   In April, Sanders told Lennon, "it must be great to be bilingual and order tacos in two different languages." (*Id*. at 61).   Next Sanders began asking Lennon, "what's the Spanish word for Taco?" (*Id*.).   Sanders later asked Lennon, "how would you say Paco, get me a taco in Spanish?" (*Id*. at 62).   This exchange was followed by similar variations like "Paco, get me a taco now-o" and "I want a taco in my moutho-o." (*Id.*).   After a colleague had a panic attack in June, Sanders asked Lennon, "why you make people crazy, Paco." (*Id*.).   After a comment from Sanders about Lennon's eating tacos, Lennon explained that he was of Spanish, not Mexican, descent. (*Id*. at 63).   Sanders responded, "same shit" and walked off. (*Id*.).   In July, while holding an axe, Sanders told Lennon, "with one chop, I could

4

make you Bobbit Latin lover."[3] (*Id.* at 63).  During a news story about the Trump campaign and the border wall, Sanders asked Lennon, "did your parents swim here or did they walk?" (*Id.* at 60).  During his eleven months at WAKA, Sanders told Lennon several times to stop "speaking spic" and also called him "taco," "paco," and "Mexican." (Docs. 60 at 9; 59-1 at 57).  Lennon continued to use Spanish because he knew it annoyed Sanders. (Docs. 60 at 11; 59-1 at 85).

In late February or early March, Lennon spoke to Halbrooks about Sander's comments. (Doc. 59-1 at 55).  Halbrooks reassured Lennon that Sanders did not mean anything.  Lennon continued to tell Halbrooks about Sander's behavior—ultimately a "half a dozen times"—without action from Halbrooks. (Doc. 67 at 9).

Around the same time that Sanders began his remarks to Lennon, it became known that Lennon was having problems with the station's production system.  WAKA pre-produced the contents of many parts of its broadcasts, which meant most of the content was computerized and preset before going live. (Doc. 60 at 12).  This system was new to Lennon. (*Id.*).  There were instances where Lennon changed the material that he wanted to include in the broadcast after the deadline. (*Id.*).  These last-minute changes would result in mistakes on the live broadcast because the directors would not know about the changes. (Doc. 59-1 at 37; 59-2 at 35–36).  WAKA identifies six instances where Lennon failed to "have his show ready on time, made changes to the coding after it was ready or made

---

[3] The Plaintiff describes this incident as "referring to John Bobbitt, whose wife, Lorena, had severed his penis with a knife while he was asleep in bed in a story that garnered international media attention in 1993." (Doc. 67 at 9 n.4)

changes to the show without telling the [d]irector." (Doc. 60 at 39).  These occasions were memorialized in a series of emails with the first technical mishap occurring on January 25, 2016—just weeks after Lennon began working at WAKA. (Doc. 59-7 at 4).  This was followed by another email in March that stated "please re-emphasize (because he has been told multiple times by all directors) that he can't add or remove or make changes to the show . . . after we are back in the control room." (*Id*. at 5).  An April email with the subject line "More Problems with Vince" reads "I know that one of the producers tried to explain it [not make last minute changes] to him . . .and he argued and had excuses and wouldn't listen. It's to the point where we can't work with him" (*Id*. at 6).  Lennon was aware of the complaints that he was not meeting the deadlines. (Doc. 59-1 at 40).  On May 6, Lennon responded, "Thanks for the feedback" to a list of at least four instances where last minutes changes created issues for show producers. (Doc. 59-7 at 7; Doc. 59-1 at 72).  As late as October 21, internal emails document Lennon making last minute changes that could not be integrated into the broadcast, and coworkers noting, "I can't tell you how many times we discussed that very thing [last minute changes] early on in his stint." (Doc. 59-7 at 8).

There were also several instances where Lennon had interpersonal issues with his colleagues. Halbrooks testified that Lennon had acted aggressively towards a director on April 29. (Doc. 59-7 at 2–3). Lennon testified that he asked the director, "[w]hat the hell happened to the top part of the show." (Doc. 59-1 at 86).  Lennon met with Halbrooks and several other WAKA employees about how he handled the confrontation with the director. (Doc. 59-1 at 85).  At this meeting between Lennon and WAKA, Halbrooks and human resources staff explained that "aggressive and in your face behavior was unacceptable . . ."

(Doc. 59-7 at 9).  In the summer of 2016, Lennon again met with a group of WAKA employees, including Halbrooks, to discuss a complaint that he had used profanity towards another employee—Lennon denies using profanity but does not deny confronting her. (Docs. 59-1 at 86; 72 at 25).  The Defendant also points to an exchange where Lennon confronted a producer saying, "do you even know how to do you job?" after a soundbite added ten minutes before the show did not appear in the broadcast. (Docs. 72 at 25; 59-7 at 10).  In June 2016, in response to technical and inter-departmental issues, Lennon received additional training that lasted twenty to thirty minutes, and he declined more training. (Doc. 59-1 at 202).

 On September 16, 2016, Lennon was suspended for three days and written up for speeding in a WAKA car with two coworkers. (Docs. 60 at 15; 59-1 at 205).  Lennon testified that he overheard a coworker, Bill Gill, tell Halbrooks that he had gotten a ticket, but he was not penalized. (Doc. 60 at 16).

In November, it was decided that WAKA would not use its option to extend Lennon's contract for another year which would start on January 8, 2017. (*Id*. at 4). Halbrooks testified that the decision was made by him and Jesse Greer (vice president and station general manager) in consultation with corporate. (Doc. 59-2 at 15).  On November 17, 2016, Halbrooks gave Lennon a letter informing him that his contract was not going to be renewed for another year. (Doc. 67 at 5, 34). The Plaintiff alleges that Sanders was also in the room. (Doc 59-1 at 53).  On November 21, 2016, Lennon walked out of the building and did not return to work at WAKA. (Doc. 60 at 4).  WAKA paid him his full salary until the end of his contract on January 7, 2017. (*Id*.).

## V. DISCUSSION

Lennon's claims against WAKA are for § 1981 race discrimination and breach of contract for failing to pay Lennon's makeup allowance.[4] Notably, Lennon brings no claims against Sanders or against WAKA relating to Sander's inappropriate workplace behavior. Instead, Lennon claims that WAKA's decision not to extend his contract was the result of intentional discrimination on the basis of his race. In its motion for summary judgment, WAKA argues that Lennon's § 1981 race discrimination claim fails for two reasons. First, WAKA argues that the Plaintiff fails to establish that he is a part of a protected racial class under § 1981. (Doc. 60 at 17). And even if Lennon is a part of a protected racial class, he is unable to establish a triable issue of material fact for a disparate racial treatment claim. (*Id*. at 2).[5] Lennon responds that he is member of a protected class and can show racial discrimination through circumstantial evidence either through the *McDonald Douglas* burden shifting framework or alternatively through a convincing mosaic of circumstantial evidence. (Doc. 67 at 19–30).

The Court first considers whether the Plaintiff has established that he is a member of a protected class.

---

[4] Although the Defendant moves for summary judgment on a race-based hostile work environment claim "out of an abundance of caution," (doc. 60 at 21), and the Plaintiff argues he has "established a prima facie case for a hostile work environment claim," (doc. 67 at 35), the Plaintiff only pled a cause of action under § 1981 for race discrimination, not a hostile work environment claim, in the operative complaint. (Doc. 18). Because a party cannot amend a complaint in summary judgment submissions, there is no hostile work environment claim before the Court.

[5] The Court has not considered the Plaintiff's arguments made at the motion to dismiss stage, which the Plaintiff sought to reincorporate by reference.

**A. Lennon's membership of a protected racial class under § 1981**

WAKA argues that the Lennon cannot establish he is a member of a group protected by § 1981 for three reasons. First, WAKA argues that the Lennon's belief that his family is historically from Castille and the Basque region is more like nation of origin evidence rather than evidence of a racial class. (Doc. 60 at 17–18). Second, WAKA argues that Lennon's testimony about what his family told him about his Spanish heritage must be excluded under the hearsay rule. (*Id*. at 18–19). And third, because his familial evidence is excluded under the hearsay rule, WAKA argues Lennon's DNA test result is insufficient to establish that he a member of a protected class. (*Id.* at 19–20). In response, Plaintiff argues that the Plaintiff's family history is enough to establish that he is Spanish and thus is a member of a class protected under § 1981.

To determine whether the Plaintiff can establish that he is in a protected class, the Court will first consider whether the evidence of the conversations with his family about his Spanish ancestry is admissible evidence. And if so, the Court will then consider whether the Plaintiff has provided enough facts that he is a member of a "race" protected under § 1981.

### 1. The Plaintiff's statements about his ancestry and family history are not inadmissible hearsay.

As an initial matter, WAKA is incorrect that Lennon's conversations with his family about his Spanish heritage are inadmissible hearsay. The Defendant correctly cites *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999), for the proposition that inadmissible hearsay cannot be considered on a motion for summary judgment. But that case goes on

to state that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1323. For example, a statement might be admissible because it falls under one of the hearsay exceptions. *Id.* Or "the hearsay declarant [could] testify directly to the matter at trial" as long as declarant is known—in contrast to an unknown hypothetical witness who could possibly come forward to testify at trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012); *Lewis v. Residential Mortg. Sols.,* 800 F. App'x 830, 834 (11th Cir. 2020).

Here, the statements about the Plaintiff's heritage are admissible because they are reducible to admissible evidence. The Plaintiff could have a member of his family testify about his Spanish heritage. In his deposition, the Plaintiff identified specific family members who would be able to testify about his Spanish heritage—not "unknown hypothetical witnesses." (Doc. 59-1 at 65–66). Alternatively, the statements from his family about his Spanish heritage fall into a hearsay exception. Fed. R. Evid. 803(19) provides that, "[a] reputation among a person's family . . . concerning the person's . . . ancestry . . .or personal history" are "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." So the Plaintiff could testify at trial about what his family told him about his family's ancestry or history.

Because the Plaintiff's statements about his Spanish ancestry would be admissible at trial, the Court will consider them for the purposes of summary judgment.

**2. The Plaintiff is able to establish that he is a member of Spanish race and, therefore, is a part of a protected class under § 1981.**

To determine if a racial group is protected under § 1981, the Supreme Court has taught that courts should consider whether the group would have been considered a race when Congress passed the law in 1866.  Section 1981 provides, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Although § 1981 does not include the word "race," it has been understood to forbid all "racial discrimination in the making of . . . contracts," including in private employment. *Runyon v. McCrary*, 427 U.S. 160, 168–172 (1976); *Johnson v. Railway Express Agency*, 421 U.S. 454, 459-460 (1975).  The Supreme Court further held that § 1981 is not limited to nonwhite citizens but instead "proscribes discrimination in the making or enforcement of contracts against, or in favor of, any race" including white or Caucasian citizens. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

In *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 610–614 (1987), the Supreme Court found that § 1981 protects against discrimination based on even more granular racial distinctions.  The Court explained that when § 1981 became law the common understanding of "race" was based on a more particularized understanding of racial groups—distinct from contemporary understandings of race tied to skin color or physiological appearance.  Namely, instead of the idea of a monolithic "white race," the nineteenth century understanding of race was tied to ethnic or national groups. *Id*. at 610–11.  For example, the Court noted that dictionaries referred to various groups such as the Finns, Germans, Basques, Spanish, and Russians as constituting different individual races.

*Id*. at 611. The Court concluded that § 1981 protects "from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id*. at 613.   The Court explained that § 1981, "at a minimum, reaches discrimination against an individual 'because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens.*'" *Id.* However, the Court noted distinctive "physiognomy" [one's form or appearance] is not necessary for protection under § 1981. *Id*.   Therefore, if the plaintiff can show "that he was subjected to intentional discrimination based on the fact that he was born a part of an racial group, *rather than solely on the place or nation of his origin*," then he can state a cognizable claim under § 1981. *Id*. at 613 (emphasis added); *see also Calvillo v. Tyson Foods, Inc.*, 2009 WL 10688893, at *6 (N.D. Ala. Jan. 26, 2009).

However, the distinction between § 1981 race and nation of origin claims is not a clear one.   As Justice Brennan noted in a concurring opinion to *Saint Francis*, the line between "ancestry or ethnic characteristics" and discrimination based on "place or nation of origin" was not a bright one. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (J. Brennan concurring).   The Eleventh Circuit too has wrestled with this notion explaining, "national origin discrimination is so closely related to racial discrimination as to be indistinguishable." *Bullard v. OMI Georgia, Inc.,* 640 F.2d 632, 634 (5th Cir. 1981).[6] When the members of a race come from a specific geographic reason, evidence of race and

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

nation of origin would conceivable be the same. *See Sinai v. New England Tel. and Tel. Co.,* 3 F.3d 471, 474–75 (1st Cir. 2003) (upholding a jury finding of Jewish or Hebrew racial discrimination under § 1981 despite the only evidence of discrimination was disparaging remarks about the plaintiff's national origin—Israel—because "race and national origin discrimination may present identical factual issues when a victim is born in a nation whose primary stock is one's own ethnic group.").

In this case, the Plaintiff has established that he is a member of the Spanish race for the purposes of § 1981. The Plaintiff testifies his family is from Spain, his grandmother was Spanish, and the family has historic ties to Castille and the Basque region. This testimony is sufficient to show that the Plaintiff is a member of the "Spanish race" for the purposes of § 1981. The Defendant argues that the Plaintiff's "description of his background appears to be a national origin issue." (Doc. 60 at 18). This argument is unpersuasive under § 1981. The "Spanish race" is most easily identifiable as comprised of the people who inhabit the nation of Spain. Therefore, evidence to show that one is a part of the Spanish race would necessary have to establish a familial connection to Spain.[7] Further, the Defendant's argument that the Plaintiff "looks like a Southern white male" is inapposite to the understanding of race at the core of § 1981. As explained in *St. Francis*, a "distinctive "physiognomy [one's form or appearance] is not essential to qualify for § 1981 protection." *Id*. at 613. And as the Supreme Court later explained, the question is not if [Spaniards] "are considered to be a separate race by today's standards, but whether,

---

[7] Because the Plaintiff is able to rely on the statements from his family about his Spanish heritage, the Court has not considered the DNA evidence.

at the time [§ 1981] was adopted, [Spaniards] constituted a group of people that Congress intended to protect." *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987).  The sources evaluated in *Saint Francis* make clear both Spanish and Basque were considered races when § 1981 was passed in 1866. *Saint Francis Coll*, 481 U.S. at 611 (citing *Basque*, 1 ENCYCLOPEDIA AMERICANA 602 (1858) (referring to Basque race); *Spanish*, 14 NEW AMERICAN CYCLOPAEDIA 804 (1863) (identifying Spanish as constituting a different race). Therefore, the Plaintiff has pointed to enough evidence to show that he is a member of the Spanish race for the prima facie stage.

### B.  Lennon's § 1981 Disparate Race Discrimination claim

The Defendant argues that the Plaintiff's § 1981 race discrimination claim should be dismissed on summary judgment because the decisionmakers at WAKA did not know the Plaintiff was Spanish and the Plaintiff cannot show through circumstantial evidence that WAKA intended to discriminate against Lennon for being Spanish.  In response, the Plaintiff argues he can demonstrate through circumstantial evidence that WAKA intended to discriminate against him because of his Spanish ancestry.

Section 1981 protects an "individual's right to be free from racial discrimination in the "making, performance, modification, enforcement, and termination of contracts", including employment contracts. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.11 (11th Cir. 2011).  Section 1981 disparate racial treatment claims use "the same analytical framework" as Title VII to prove intentional discrimination.  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).  The main difference between the two

laws, as the Supreme Court recently recognized, is that § 1981 requires a showing "that race was a but-for cause," rather than a motivating factor, as in Title VII, of the adverse employment action. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  Nevertheless, under both standards, a plaintiff may prove intentional discrimination through direct or circumstantial evidence. *Jefferson v. Sewon Am., Inc.,* 891 F.3d 911, 921 (11th Cir. 2018).  Direct evidence is "that, if believed, proves the existence of discriminatory intent without inference or presumption." *Id*.  For example, a statement made that the employer fired the plaintiff because of his race would be an example of direct evidence.  Unsurprisingly employers do not commonly make statements of this nature, so plaintiffs additionally or alternatively may rely on circumstantial evidence.

In contrast to direct evidence, circumstantial evidence "suggests, but does not prove, a discriminatory motive." *Id*. (citing *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079 (11th Cir. 2004)).  The most common means of using circumstantial evidence to show a discriminatory motive is the *McDonald Douglas* burden shifting framework.  Under this framework, the Plaintiff must first establish a prima facie case of discrimination by showing the plaintiff was a member of a protected class, qualified for the position, suffered an adverse employment decision, and was replaced or treated less favorably than a similarly situated person—a comparator—outside the Plaintiff's protected class.  *Maynard v. Bd. of Regents of Div. of Universities of Fla. Dep't of Educ. ex rel. Univ. of S. Fla*., 342 F.3d 1281, 1289 (11th Cir. 2003).  A recent Eleventh Circuit *en banc* panel emphasized that the comparator analysis is central to establishing the prima facie case because "only by demonstrating that [an] employer [ ] treated 'like' employees 'differently'—*i.e.*, through

an assessment of comparators—[can] a plaintiff [ ] supply the missing link and provide a valid basis for inferring unlawful discrimination." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1223 (11th Cir. 2019) (en banc) ("*Lewis I*"). Therefore, the Circuit *en banc* concluded that a plaintiff and comparator must be "similarly situated in all material respects." *Id.* at 1226. So once a plaintiff produces evidence of each element of a prima facie case, the burden shifts to the defendant to produce a legitimate non-discriminatory explanation for the adverse employment action. *Lockheed-Martin Corp.*, 644 F.3d at 1325-1326. And upon this showing, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual for actual discrimination. *Id*. at 1326.

But as the Eleventh Circuit has recognized, "establishing the elements of the *McDonald Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lockheed-Martin Corp.*, 644 F.3d at 1328. Instead, a plaintiff will survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *Id*. The commonly described "convincing mosaic" may be shown by evidence of "(1) suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*)

In this case, the Plaintiff, through the presentation of circumstantial evidence, argues that he can use the *McDonald Douglas* framework to show intentional discrimination, but

if he cannot—specifically if he is unable to identify a comparator—then he would be able to alternatively survive summary judgement based on a convincing mosaic of circumstantial evidence. (Doc. 67 at 27–34). Because of the conditional nature of this argument, the Court will first evaluate the Plaintiff's case under the *McDonald Douglas* burden shifting framework. And if this analysis demonstrates there is no appropriate comparator to Lennon and thus cannot show a triable issue of discrimination under *McDonald Douglas*, the Court will evaluate whether a convincing mosaic of circumstantial evidence exists to create a triable issue of the defendant's discriminatory intent.

### 1. *McDonald Douglas Burden Shifting Framework*

Under *McDonald Douglas,* the Plaintiff must first establish a prima facie case through showing the plaintiff was a member of a protected class, qualified for the position, suffered an adverse employment decision, and was replaced or treated less favorably than a comparator "similarly situated in all material respects" outside the Plaintiff's protected class. *Maynard*, 342 F.3d at 1289; *Lewis I*, 918 F.3d at 1226. WAKA argues that the Lennon's race discrimination claim fails at the prima facie stage for two reasons: the Plaintiff is unable to show that he is a member of a protected class and is also unable to identify an appropriate comparator. (Doc. 60 at 36–37).

As previously discussed, the Plaintiff can establish for the purposes of summary judgment that he is a member of the Spanish race, which is a protected class under § 1981. *See supra* 9–14. The Defendant does not dispute that the Plaintiff was qualified for the position or that the Plaintiff was subject to an adverse employment action. (Docs. 60 at 36; 67 at 26–27). However, the Defendant argues that the Plaintiff fails to identify a

comparator.  The Plaintiff, in response, points to Bill Gill, a WAKA photographer, and fleetingly to Adam Solomon, his replacement, as appropriate comparators.  Therefore, for the Plaintiff to establish a prima facie case for employment discrimination, the Court must determine whether either of the potential comparators are "similarly situated in all material respects" to the Plaintiff.

To determine if Lennon and Gill were "similarly situated in all material respects", the Court considers whether they both (1) engaged in the same basic conduct (or misconduct) as the plaintiff; (2) were subject to the same employment policy,  guidelines, or rules as the plaintiff; (3) were under the same supervisor; and (4) share the same employment and disciplinary history. *Lewis I*, 918 F.3d at 1227–28.  The Plaintiff argues that Gill received more favorable treatment than him from Halbrooks because, although Gill had gotten a ticket, presumably on company time, he was not suspended for speeding like the Plaintiff. (Doc. 67 at 27).  Although Gill was likely subject to the same employment guidelines as the Plaintiff and had the same supervisor (Halbrooks), the Plaintiff and Gill were not engaged in the same misconduct.  The Defendant explains that the Plaintiff was not suspended for receiving a speeding ticket but was instead suspended for "driving at an excess speed with other employees in the car." (Doc. 72 at 21).  Although the Plaintiff and Defendant dispute why and how much the Plaintiff was speeding, the Plaintiff never denied he was speeding in a car with his colleagues. (Doc. 67 at 27). Further, there is no evidence that Gill had the same disciplinary history as the Plaintiff.  Therefore, the two were not "similarly situated in all material respects."

The Court next turns to Adam Solomon—the Plaintiff's replacement.  Courts have recognized that a plaintiff can establish the comparator prong of the prima facie case by showing that he was replaced by someone outside of his protected class. *Hinton v. Alabama State Univ.*, 2021 WL 922176, at *2 (M.D. Ala. Mar. 10, 2021); *See Herren v. La Petite Academy, Inc.*, 820 F.App'x 900, 904 (11th Cir. 2020) (concluding that plaintiff identified a comparator because she showed that she "was replaced by someone outside her protected class—a younger, African-American employee"); *Maynard*, 342 F.3d at 1289.  Although the Plaintiff identifies Adam Solomon—his replacement—as a potential comparator, the Plaintiff did not testify that the Solomon was outside of his protected class.  The Plaintiff claims not to know the race or ethnicity of Solomon.  In his deposition, he instead testified, "I don't think he's is Hispanic.  He could be.  I don't know."  (Doc. 59-1 at 66).  Because the Plaintiff provides no evidence that Solomon was outside his protected class, he cannot show that he had non-Spanish replacement, and, therefore, the Plaintiff fails to show Solomon is an appropriate replacement.

Because the Plaintiff cannot point to a valid comparator, he is unable to establish a prima facie case under the *McDonald Douglas* burden shifting framework, so he is left to show that a convincing of mosaic of circumstantial evidence would allow a reasonable jury to find WAKA intentionally discriminated against him.

### 2.  *Convincing Mosaic of Circumstantial Evidence*

The Eleventh Circuit has explained that "[n]ot every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator," so failure to produce one does not necessarily doom the plaintiff's case. *Lewis v. City of Union City,*

*Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*).  A plaintiff may still survive summary judgment by presenting enough circumstantial evidence of discriminatory intent to create a triable issue of fact for a jury. *Lockheed-Martin*, 644 F.3d at 1328.  A plaintiff can show a convincing mosaic by pointing to "(1) suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  *Lewis II*, 934 F.3d at 1185.

The Plaintiff's argument for how he has created a convincing mosaic of circumstantial evidence can be synthesized into two main points.  First, although Plaintiff recognizes that Halbrooks denies knowing of his Spanish heritage, he argues there is a jury question of "whether one or more of the decisionmakers were motivated by the Plaintiff's race," because Sanders was in the room when he was told that his contract was not extended.  (Doc. 67 at 29–30).   He argues that this is supported by the Defendant's knowledge of the Plaintiff' Spanish ethnicity because of his many complaints of "racial harassment," and the Plaintiff was "terminated" a week after his last complaint about Sanders.  (*Id.* at 28).  Second, the Plaintiff argues that the Defendant's stated reason for not extending his contract are pretext for discrimination—specifically the "more likely [reason] is that Defendant got tired of the Plaintiff's complaints about Sander's race-based harassment." (*Id*. at 34).

Because the "convincing mosaic" does away with the familiar *McDonald Douglas* burden shifting and simply asks whether the plaintiff "presents evidence that creates a triable issue concerning the employer's discriminatory intent," *Lockheed-Martin*, 644 F.3d

at 1328, the Court is left to put all the pieces of the Plaintiff's circumstantial evidence in a pile and determine if there is enough so that a reasonable fact finder could assemble a mosaic of intentional discrimination. Because this is necessarily an idiosyncratic evidentiary evaluation, the Court will evaluate the Plaintiff's evidence based on how it was presented by the Plaintiff. Because "bits and pieces from which an inference of discriminatory intent might be drawn" are relatively few—namely that his supervisors were aware of the racial harassment and did not extend his contract shortly after a complaint— the Court will start with the Plaintiff's argument that Defendant's reasons are pretext for race discrimination. Then, the Court will consider, depending on whether the Plaintiff has shown pretext for discrimination, if the Plaintiff could piece together a mosaic of intentional discrimination.

### a. The Plaintiff fails to show that the Defendant's reasons for not extending his contract are pretext for race discrimination.

In *Lewis II*, the court recognized that a Plaintiff can show pretext under the convincing mosaic analysis by (1) casting doubt that the employer's reasons were not what actually motivated the conduct, (2) showing that the employer's articulated reason is false and hid discrimination, or (3) establishing that the employer has failed to clearly articulate and follow its formal policies. *Lewis II*, 934 F.3d at 1186.

Although the Defendant says it did not extend Lennon's contract for a series of technical performance issues and interpersonal problems, the Plaintiff argues that the Defendant's stated reasons are pretext for three reasons. First, the Plaintiff argues that the Defendant has given inconsistent reasons for not extending his contract. (Doc. 67 at 31–

32).  Second, the technical issues that Lennon was reprimanded for are not consistent with industry standards and were also a result of an incompetent staff. (*Id*. at 32–33).  And finally, the Plaintiff argues that the events leading up to the Defendant not extending Lennon's contract are suspicious. (*Id*. at 34).

I. The Plaintiff fails to show that WAKA's explanations for not extending his contract are inconsistent.

Lennon's argument that the Defendant's reason for not extending his contract are inconsistent is unpersuasive.  Because the Defendant did not give a reason in *writing*[8] why Lennon's contract was not extended and Halbrooks testified Plaintiff was not "terminated for cause," the Plaintiff argues that the reasons stated in Defendant's motion for summary judgment for not extending the Plaintiff's contract—namely his technical and interpersonal issues—represent a new and, therefore, inconsistent explanation for why WAKA did not extend his contract. (Doc. 67 at 31–32).  Not only does this argument misconstrue the nature of the adverse employment action, it also mischaracterizes Halbrooks's deposition testimony.  The Plaintiff repeatedly refers to the adverse employment action as a "termination," but the Plaintiff was not "terminated" on November 17.  Instead, WAKA declined to exercise its two one-year options to extend the Plaintiff's contract.  Therefore, the Defendant did not terminate Lennon's employment with WAKA on November 17— his employment ended, as specified in his contract, on January 7, 2017.  This is reflected

---

[8] Although the Plaintiff states that WAKA did not give him a reason for not extending his contract in the written letter provided to him, (doc. 67 at 31), Lennon cannot say that he was not given any reason why his contract was not extended.  In his deposition, the Plaintiff testified that Halbrooks told him, "the speeding and all sorts of stuff" were the reasons his contract was not extended. (Doc. 59-1 at 53).

in the Defendant's continuing to pay the Plaintiff for the remainder of the contract term—even though he stopped coming to work from November 21, 2016, to January 7, 2017. Indeed, when Halbrooks answered that the Plaintiff "was not terminated for cause," he was testifying to the fact that WAKA had not used its right to terminate Lennon prior to the end of the contract term for a reason specified in the employment contract.[9] (Doc. 59-2 at 91–92). Halbrooks was not—as the Plaintiff would like this Court to believe—saying there were no reasons for not extending the Plaintiff's contract. So the Defendant's stated reasons for not extending the Plaintiff in the summary judgment briefs are not inconsistent and, therefore, do not demonstrate pretext.

II.    The Plaintiff fails to establish that the Defendant's stated reasons for not extending his contract were pretext for discrimination.

The Plaintiff also argues that the Defendant's stated reasons for not extending his contract are also demonstrative of pretext. The Defendant argues that it did not extend Lennon's contract because Lennon had performance and behavioral problems. (Doc. 60 at

---

[9] Halbrooks's testimony makes it clear what he meant by "cause":

> Q. Look at the bottom of page 5, numbered paragraph 12B, it says, "Further, WAKA shall have the right to terminate this agreement for cause," and cause is defined. Was Vince Lennon terminated for cause?
> A. Vince Lennon's contract option was not picked up.
> Q. I take that as a no; correct? He was not terminated for cause?
> A. The company had the option to determine whether to pick up the option year on Vince Lennon's contract, and the company decided not to exercise that option.
> Q. And so was Vince terminated?
> A. Vince Lennon's contract option was not picked up. . .
> Q. Okay. So I'll go back to my earlier question. Was Vince Lennon terminated for cause?
> A. Vince Lennon was not terminated for cause.

(Doc. 59-2 at 11).

38).  Regarding performance issues, the Defendant identifies six instances where Lennon failed to "have his show ready on time, made changes to the coding after it was ready, or made changes to the show without telling the director." (*Id*. at 39). These occasions were memorialized in emails with the first technical mishap occurring on January 25, 2016— just weeks after Lennon began working at WAKA. (Doc. 59-7 at 4).  This was followed by another email in March that states "please re-emphasize (because he has been told multiple times by all directors) that he can't add or remove or make changes to the show . . . after we are back in the control room." (*Id*. at 5).  An April email with the subject line "More Problems with Vince" reads, "I know that one of the producers tried to explain it [not making last minute changes] to him . . .and he argued and had excuses and wouldn't listen. It's to the point where we can't work with him" (*Id*. at 6).  On May 6, Lennon responded, "Thanks for the feedback" to a list of at least four instances where last minutes changes created issues for show producers. (*Id*. at 7; Doc. 59-1 at 72).  As late as October 21, internal emails document Lennon making last minute changes that could not be integrated into the broadcast, and coworkers noting, "I can't tell you how many times we discussed that very thing [last minute changes] early on in his stint." (Doc. 59-7 at 8).

The Defendant also identifies several instances where the Plaintiff cursed or acted inappropriately towards his coworkers. (Doc. 72 at 25).  On April, Halbrooks testified in an affidavit that Lennon had acted aggressively towards a director on April 29. (Doc. 59-7 at 3).  Lennon testified that he asked the director, "[w]hat the hell happened to the top part of the show." (Doc. 59-1 at 86).  The Defendant points to an email that describes a meeting between Lennon and WAKA where it was explained that "aggressive and in your face"

24

behavior was unacceptable" and further discussed a number of technical issues that directors had with the Plaintiff. (Doc. 59-7 at 9).   In another instance, the Plaintiff was confronted after he alleged berated another sports department employee.   The Defendant notes that the Plaintiff denies using profanity but does not deny he berated her. (Doc. 72 at 25).   The Defendant also points to an exchange where the Plaintiff confronted a producer saying, "do you even know how to do your job?" after a soundbite added by Lennon ten minutes before the show did not appear in the broadcast. (Docs. 72 at 25; 59-7 at 10).   The Defendant argues that these interpersonal and technical issues were sufficient not to extend his contract.

To show that the Defendant's reason is pretext, the Plaintiff must meet the Defendant's nondiscriminatory reason head on, rebut it, and not just quarrel with the wisdom of that reason. *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000).   The Plaintiff argues that the Defendant's explanations mask the reality of being sports news anchor.   Specifically, prohibiting last minute changes, especially in the sports context, is far from the industry standard.   (Doc. 67 at 33 n. 46).   He also argues that most of the comments about his technical abilities are "voiced by inexperienced and ill prepared people who were not in command or ready for a director's chair." (*Id*.).   He also points to other possible explanations such as game delays, live sports changing, technical issues, and WAKA's antiquated equipment.   (*Id*. at 33–34)

Although the Plaintiff provides explanations for why his performance fell outside of the standard required by WAKA, he does not rebut head on that these reasons were pretextual.   He instead suggests that standard which he was held was outside of the industry

norm, but he does not show or argue that it was applied to him in discriminatory way.  The Plaintiff only identifies one instance in April 28, 2016, where he states he did not engage in the alleged conduct.  He says he could not have possibly made changes after the deadline because the broadcast was already "locked."  (*Id*. at 33).  But in reply, the Defendant notes that there were three other technical issues that happened on April 28 that the Plaintiff does not dispute. (Doc. 72 at 26). In response to accusations of interpersonal issues, the Plaintiff denies cursing in front of his subordinate and testifies that he did not act aggressively towards anyone. (Doc. 67 at 16–17).  But he does not deny that he was reprimanded for these issues or that he discussed them with his supervisors.

Because the Plaintiff fails to show that "the defendant's reasons were not what actually motivated their conduct" or "that the employer's reason is false and hid discrimination," the Plaintiff has failed to show that the Defendant reasons for not extending his contract are pretextual. *Lewis II*, 934 F.3d at 1186.

III.   The Plaintiff fails to show that the timing of the decision not to extend his contract is suspicious.

Lennon argues that the fact the decision not to extend his contract was made the week after his last complaint about Sanders is evidence of discrimination.[10]  The Defendant responds that the timing of Lennon's contract not being extended is not particularly suspicious in light of the months of complaints about his lack of technical proficiency and his ability to interact with others.  When asked about the leadup to not extending Lennon's contract, Halbrooks also testified, "as you can see by the contract, there was a timeliness

---

[10] As the Defendant points out, Lennon's cause of action is for race discrimination—not race retaliation.

factor, if we were not going to pick up the option." (Doc. 59-2 at 16).   Pursuant to the contract, WAKA was required to notify Lennon forty-five days before the end of his term whether it was going to exercise its option, which would have been November 23, 2016—a week after he was given the letter.   (*Id.* at 88).   Therefore, the timing of WAKA not exercising its option was driven by the terms of the contract and does not, without more, raise an inference of discrimination.

> **b. The remaining pieces of circumstantial evidence do not create a convincing mosaic of intentional discrimination.**

Because the Plaintiff is unable to show that the Defendant's reasons are pretext for intentional race discrimination, the Defendant only has a few bits and pieces of information in his evidentiary pile—namely, the instances he complained about Sanders harassing him for his Spanish heritage.   So to prevail on an intentional discrimination claim, the Plaintiff must show the inappropriate statements by Sanders and the Plaintiff's complaints about them caused Halbrooks and other decisionmakers to decide to not extend Lennon's contract *because of* or *but for* his Spanish ethnicity.   *Comcast Corp.*, 140 S. Ct. at 1014.    To accomplish this, the Plaintiff argues that Halbrooks did not extend his contract because of his Spanish race, and that Sanders took some part in the decision.

However, any notion that Halbrooks fostered animus or bias against the Plaintiff because of his Spanish ancestry is undermined by the Plaintiff's own deposition testimony. The Plaintiff testified, "the real reason [he did not extend his contract] was he was protecting Jeff [Sanders]." (Doc. 59-1 at 53).   When asked whether Halbrooks ever said negative things about the Plaintiff's ancestry, the Plaintiff answered, "not Halbrooks."

(Doc. 59-1 at 53).  When asked whether Halbrooks terminated the Plaintiff "because of his ancestry," the Plaintiff answered, "I think it was part of the reason."  But when asked what would motivate Halbrooks to terminate the Plaintiff because of his ancestry, the Plaintiff answered, "I don't know." (*Id*.).  When asked if he thought that he would have been terminated regardless of his race, the Plaintiff again said, "I didn't know." (*Id*. at 54).  And when asked what evidence he had to show it was because of his Spanish ancestry, the Plaintiff again pointed to the multiple times he complained about Sanders.  Other than making the complaints themselves, the Plaintiff cannot point to any evidence that would connect these complaints to the decision not to extend his contract because he is Spanish.  Even the Plaintiff's testimony that he believed race was a factor is insufficient under § 1981 because he must prove his contract would have been renewed but for intentional discrimination. *Comcast Corp.*, 140 S. Ct. at 1014.  Because the Plaintiff cannot point to any evidence that Halbrooks discriminated against him because his Spanish ancestry, the Plaintiff's speculative allegations against Halbrooks are unavailing.

The Plaintiff finally asserts that Sanders had some part in the decision not to renew the Plaintiff's contract.  The only support for this claim is the allegation that Sanders was present when Halbrooks gave Lennon his non-renewal letter. (Doc. 59-1 at 53).  However, the Plaintiff undermines his argument that Sanders had a role in the decision to not extend his contract.  When asked in his deposition who made the decision to terminate him, Lennon answered, "I'm guessing it was Glenn Halbrooks.  He's the supervisor and he's the one that delivered it and told me. . . as far as I know, it was him as the immediate

supervisor." (*Id*.)  Halbrooks confirmed this when he testified that the decision was made by him and Jesse Greer (vice president and station general manager) with consultation with WAKA's corporate office. (59-2 at 15).  Because the Plaintiff provides no evidence that Sanders took part in the decision not to extend his contract, he fails to link Sander's inappropriate workplace behavior to the employment action about which he complains.

Because the Plaintiff fails to show the Defendant's stated reasons for its decision not to renew his contract are pretextual and fails to point to other evidence to show intentional discrimination, the Plaintiff fails to create a convincing mosaic of circumstantial evidence upon which a reasonable jury could find intentional discrimination.  Therefore, the Defendant's motion for summary judgment is GRANTED.

### C.  The Court declines supplemental jurisdiction over the remaining claim.

Because the Court grants the Defendant's motion for summary judgment on the § 1981 race discrimination claim, the only remaining claim before this Court is a two-hundred-dollar breach of contract claim for Lennon's makeup allowance.  The Defendant asks the Court to decline to exercise supplemental jurisdiction over this claim.

28 U.S.C.A. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, "district courts may decline to exercise supplemental jurisdiction

over a claim under subsection (a) . . . if the district court has dismissed all claims over which it has original jurisdiction." § 1367(c).

Because this Court dismisses the § 1981 claim, the Court declines supplemental jurisdiction over the breach of contract claim.  Therefore, the claim is DISMISSED without prejudice.

## VI. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. The Defendant's Motion for Summary Judgment, (doc. 58), is GRANTED.

3.  Final judgment will be entered in favor of the Defendant and against the Plaintiff.

Done this 20th day of April, 2021.


/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE